# Syllabus

Chief Justice:
Bridget M. McCormack

Justices:
Brian K. Zahra
David F. Viviano
Richard H. Bernstein
Elizabeth T. Clement
Megan K. Cavanagh
Elizabeth M. Welch

**This syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader.**

Reporter of Decisions:
Kathryn L. Loomis

## TAXPAYERS FOR MICHIGAN CONSTITUTIONAL GOVERNMENT v STATE OF MICHIGAN

Docket Nos. 160658 and 160660. Argued March 4, 2021 (Calendar No. 4). Decided July 28, 2021.

Taxpayers for Michigan Constitutional Government, Steve Duchane, Randall Blum, and Sara Kandel brought an original action in the Court of Appeals against the state of Michigan; the Department of Technology, Management, and Budget; and the Office of the Auditor General to enforce § 30 of the Headlee Amendment, Const 1963, art 9, § 30, which prohibits the state from reducing its budget for total state spending paid to all units of local government, taken as a group, below that proportion in effect in fiscal year 1978–1979. Plaintiffs alleged in a four-count complaint that the state's accounting practices have resulted in violations of the Headlee Amendment: Count I asserted that the state violated § 30 by classifying as state spending paid to local government monies paid to school districts pursuant to Proposal A, Const 1963, art 9, § 11; Count II made the same assertion as to monies paid to public school academies (PSAs) pursuant to Proposal A and MCL 380.501(1); Count III alleged that the state improperly classified as § 30 state spending those funds paid to maintain trunk-line roads; and Count IV sought a determination that state funds directed to local governments for new state mandates may not be counted toward the proportion of state funds required by § 30. The Court of Appeals, BORRELLO, P.J., and FORT HOOD and SHAPIRO, JJ., dismissed Count III without prejudice upon stipulation of the parties in an unpublished order entered on December 4, 2017 (Docket No. 334663). Both plaintiffs and defendants moved for summary disposition pursuant to MCR 2.116(C)(10). In a published decision on reconsideration, the Court of Appeals, BORRELLO, P.J., and METER and SHAPIRO, JJ., granted defendants summary disposition on Count I, holding that Proposal A spending is properly categorized as state funding to a unit of local government. 330 Mich App 295 (2019) (opinion by SHAPIRO, J.). The panel majority also granted summary disposition to the state defendants on Count II, over a partial dissent from Judge METER, holding that state aid to PSAs falls within the scope of state spending to units of local government under § 30. The panel majority granted plaintiffs' motion for summary disposition on Count IV, over a partial dissent from Judge BORRELLO, holding that state spending to fund state-mandated local services as required by § 29 should not be included in the state's calculation of the proportion of total state spending under § 30. Finally, the panel granted plaintiffs mandamus relief and directed the state to comply with reporting requirements found in MCL 21.235(3) and MCL 21.241. Both plaintiffs and defendants sought leave to appeal in the Supreme Court, and the Supreme Court granted the applications. 505 Mich 1136 (2020).

In an opinion by Justice CAVANAGH, joined by Chief Justice MCCORMACK and Justices BERNSTEIN, CLEMENT (except as to Part VIII), and WELCH, the Supreme Court *held*:

Proposal A payments to school districts and § 29 state spending to fund new state-mandated local services and activities are both properly counted in the calculation of total state spending to all units of local government under Const 1963, art 9, § 30; a PSA is not a "school district" within the meaning of Const 1963, art 9, § 33; PSAs themselves are not political subdivisions of the state for purposes of the Headlee Amendment, but on remand the Court of Appeals must consider whether PSA funding should be counted as spending paid to a unit of local government if the authorizing body of the PSA is a school district, intermediate school district, or community college; and the Court of Appeals' grant of mandamus was vacated and remanded to the Court of Appeals for clarification.

1. The Court of Appeals correctly held that Proposal A spending is properly categorized as state spending paid to a unit of local government. Const 1963, art 9, § 30 provides that the proportion of total state spending paid to all units of local government, taken as a group, shall not be reduced below that proportion in effect in fiscal year 1978–1979. Const 1963, art 9, § 25 provides, in pertinent part, that the state is prohibited from shifting the tax burden to local government and that implementation of § 25 is specified in §§ 26 through 34. Section 25 is a preface meant to provide context to the amendment as a whole and is not an independent statement of a substantive right. Because the constitutional language was clear, reliance on drafters' notes regarding § 25 was inappropriate. And because § 25 was not a provision that could be independently enforced, the inquiry into whether Proposal A funding should be counted as part of "total state spending paid to all units of Local Government, taken as a group" under § 30 was straightforward. Section 33 provides that the term "local government" includes school districts. Proposal A funding paid to school districts is state funding paid out of the State School Aid Fund. Accordingly, Proposal A funding is money collected and disbursed by the state to a unit of local government, and it was accurate to include Proposal A funds in determining the total state spending paid to all units of local government. Therefore, the Court of Appeals' grant of summary disposition to defendants on Count I was affirmed.

2. The Court of Appeals improperly concluded that a PSA is a "school district" within the meaning of Const 1963, art 9, § 33. Section 33 defines "local government" as any political subdivision of the state, including, but not restricted to, school districts, cities, villages, townships, charter townships, counties, charter counties, authorities created by the state, and authorities created by other units of local government. A PSA is a state-supported public school operating under a charter contract issued by a public authorizing body. Simply because a PSA is a "school district" for purposes of Proposal A funding does not necessarily mean that a PSA is also a "school district" as contemplated by the Headlee Amendment. Rather, the Headlee voters would not have considered PSAs as equivalent with "school districts" as the term was understood at the time the amendment was ratified. Like traditional school districts, PSAs deliver education to the students of this state, but they do not resemble traditional school districts in many other ways: PSAs are organized as nonprofit corporations by a person or other entity, while school districts are legislative creations; PSAs are not limited to a defined local geographic area like school districts; instead of a locally elected school board directly beholden to the voters of a school district, the governing body of a PSA is made up of a board of directors comprised of privately selected members; unlike a school district board, the board of directors of a PSA may enter into a contract with an education-

management corporation to manage or operate the PSA or to provide the PSA with instructional or other services; and a PSA is funded solely by the state and may not levy taxes like a school district. In fact, a PSA is often viewed as an alternative to the traditional educational services offered by a school district, not an equivalent. Accordingly, a PSA is not a "school district" as Headlee voters would have understood the term. Furthermore, while PSAs deliver traditional governmental services, their distinctive marks are not those of a "political subdivision of the state" as the voters who ratified the Headlee Amendment in 1978 would have understood the term. A PSA authorized by the governing board of a state public university, MCL 380.501(2)(a)(*iv*), is definitively not a political subdivision of the state. A PSA is not itself a political subdivision of the state, nor is a state university. A PSA authorized by the governing board of a state public university is not geographically limited, and it is responsive to the voters of the state of Michigan at large, not to voters of any particular locale. Therefore, those PSAs are not included in the definition of "Local Government" under § 33 of the Headlee Amendment, and any state funding they receive should not be counted under § 30 as part of "total state spending paid to all units of Local Government." However, aside from state public universities, MCL 380.501(2)(a)(*i*) to (*iii*) also empowers the boards of school districts, intermediate school districts, and community colleges to authorize PSAs. If, for example, a traditional school district—a "local government" under § 33 of the Headlee Amendment—experiments with the charter-school model to provide educational services to local children, this might properly be counted as state spending to a unit of local government under § 30. Accordingly, although a PSA is not itself a political subdivision of the state, the case had to be remanded to the Court of Appeals to consider whether state funding to PSAs authorized by a school district, an intermediate school district, or a community college should be counted as state spending paid to a unit of local government for purposes of § 30 of the Headlee Amendment.

3. The Court of Appeals improperly held that state funds provided to local governments to satisfy state obligations under § 29 of the Headlee Amendment should not be counted in the calculation of total state spending to units of local government under § 30. Section 29 requires the state to provide funding if the state requires a unit of local government to engage in a new activity or service, and § 29 prohibits the state from reducing the financed proportion of the necessary costs of any existing activity or service as provided for in 1978. In this case, the Court of Appeals erred by relying on the drafters' notes to § 29 without considering the plain language of the amendment. There are two types of state spending for purposes of § 30—state spending paid to units of local government and all other state spending. Nothing in § 30 suggests that total state spending paid to all units of local government should not include state spending to local governments to support both new and existing § 29 state mandates. And § 29 is silent as to whether § 29 funds should be included or excluded in the § 30 calculation of total state spending to units of local government. State funding to a unit of local government is state funding to a unit of local government, whether that funding is tied to a state mandate or is unrestricted aid for discretionary spending. Accordingly, state funding provided to units of local government as required by § 29 should be counted for purposes of total state spending paid to all units of local government under § 30, and the judgment of the Court of Appeals was reversed on Count IV.

4. The Court of Appeals' grant of mandamus was vacated. To obtain the extraordinary remedy of mandamus, a plaintiff bears the burden of showing that the plaintiff has a clear legal right to performance of the specific duty sought; that the defendant has a clear legal duty to perform; that the act is ministerial; and that no other adequate legal or equitable remedy exists that

might achieve the same result. In this case, plaintiffs did not provide any argument or explanation regarding mandamus except for a single mention in the prayer for relief of their complaint that requested mandamus relief directing the state to comply with the reporting requirements of MCL 21.235 and MCL 21.241. When plaintiffs moved for summary disposition, they again included no in-depth discussion of the mandamus issue. Accordingly, there was a question as to whether the request for mandamus was even adequately pleaded. The Court of Appeals' grant of mandamus was puzzling. It was unclear in many respects; it vaguely ordered "the state through its officers and departments" to comply with MCL 21.235 and MCL 21.241 when those statutes apply to the governor (who was not a named defendant in this action) and to the Department of Technology, Management, and Budget; and it was unclear whether the duties to be performed were ministerial or involved the exercise of discretion. Moreover, the panel's explanation that the writ of mandamus was to be "prospective only" because plaintiffs "waived their claim to compensation for the state's past practice of counting funding for new or increased mandates for purposes of § 30" appeared to be unrelated to the actual mandamus relief granted—compliance with the annual reporting requirements of MCL 21.235(3) and MCL 21.241. Accordingly, because the nature of the relief requested or granted was unclear, Part III(D) of the Court of Appeals opinion had to be vacated, and this issue was remanded to the Court of Appeals with the direction that it specify which defendant is failing to perform which clear legal duty and that it analyze whether granting the extraordinary writ of mandamus was warranted.

Part III(B) of the Court of Appeals opinion affirmed; Parts III(C) and (D) of the Court of Appeals opinion reversed; Part III(E) of the Court of Appeals opinion vacated; and case remanded to the Court of Appeals to consider whether PSA funding should be counted as spending paid to a unit of local government if the authorizing body of the PSA is a school district, intermediate school district, or community college and to clarify the Court of Appeals' grant of mandamus relief.

Justice VIVIANO, joined by Justice ZAHRA, concurring in part and dissenting in part, agreed with the majority's decision in all respects except as to Part VI regarding funding for PSAs. Because PSAs, as a category, qualify as political subdivisions of the state under Const 1963, art 9, § 33, Justice VIVIANO would have held that state spending for PSAs is properly considered "spending paid to all units of Local Government" under Const 1963, art 9, § 30. The definition of "Local Government" in Const 1963, art 9, § 33 contemplates a broad and inclusive definition of that term. It means "any" political subdivision, and the phrase "including, but not restricted to" contemplates that there are entities that qualify as local governments beyond those explicitly listed. At the time that the Headlee Amendment was ratified, political subdivisions had pertinent characteristics that included a geographically limited unit of government, formed to exercise political power, and that is beholden to a local electorate. They also operated as a division of the state to exercise some governmental function for the public benefit, had a capacity for self-governance, and sometimes wielded the power of taxation. Those characteristics should be considered in the context of the enumerated examples provided in § 33 because the Court cannot define the general term "political subdivision" in a way that would exclude one or more of those examples. PSAs have characteristics similar to both school districts and authorities that existed in 1978. Like school districts, PSAs provide educational services; these services are a governmental function operated for the public benefit. Certain PSAs also operate in a limited geographic area in a similar manner to certain authorities and school districts. PSAs also resemble other authorities that do not have strict geographic boundaries but will be confined by necessity to a certain area of operations. Next, while PSAs lack the power of taxation, this factor was not dispositive; authorities

often lacked this power, yet § 33 still lists them as examples of political subdivisions. School districts also lack the power to raise operating funds through the imposition of property taxes after the passage of Proposal A, Const 1963, art 9, § 11. Finally, PSAs have sufficient ability to self-govern and have electorate control through the public authorizing bodies. Because the governing bodies of authorities in existence in 1978 were almost universally chosen—not by the electorate directly, but by the participating municipalities or state officers—a political subdivision does not need to have either *direct* electoral control or *total* self-governance for purposes of the Headlee Amendment. Rather, in light of the authorities in existence at the time of ratification, so long as there is some public, electoral control of a political subdivision through an authorizing body, municipality, or state officer, that is enough to weigh in favor of finding that an entity is a political subdivision. Accordingly, Justice VIVIANO would have held that PSAs qualify as political subdivisions under § 33 and that state spending for PSAs qualifies as part of the total state spending paid to all units of local government under § 30.

Justice CLEMENT, concurring in part and dissenting in part, agreed with the Court's resolution of the substantive Headlee Amendment claims but dissented as to the Court's disposition of the state's challenge to the Court of Appeals' issuance of the writ of mandamus. While she concurred with the Court's decision to vacate the entire mandamus portion of the Court of Appeals opinion, because this aspect of plaintiffs' case was inadequately pleaded, Justice CLEMENT would not have directed that Court to continue struggling on remand with an issue that was not adequately framed. In this case, all four of plaintiffs' counts in their complaint were substantive Headlee Amendment claims; not one was a count seeking a writ of mandamus. The only mention of mandamus in the complaint was a single line in the prayer for relief. The complaint offered no allegations about what legal duties MCL 21.235 and MCL 21.241 impose on any public officers, and no actual public officers were named as defendants. The Court of Appeals similarly did not address which officers needed to perform which duties. The burden was on plaintiffs to plead facts establishing the elements of the cause of action, and plaintiffs here did not even list mandamus as one of the counts in their complaint. Therefore, Justice CLEMENT would have simply held that plaintiffs' complaint was inadequate and would have vacated Part III(E) of the Court of Appeals opinion without directing the Court to work further on the mandamus issue on remand.

# OPINION

Chief Justice:
Bridget M. McCormack

Justices:
Brian K. Zahra
David F. Viviano
Richard H. Bernstein
Elizabeth T. Clement
Megan K. Cavanagh
Elizabeth M. Welch

FILED July 28, 2021

S T A T E   O F   M I C H I G A N

SUPREME COURT

TAXPAYERS FOR MICHIGAN
CONSTITUTIONAL GOVERNMENT,
STEVE DUCHANE, RANDALL BLUM,
and SARA KANDEL,

Plaintiffs-Appellants,

v                                                            No. 160658

STATE OF MICHIGAN, DEPARTMENT
OF TECHNOLOGY, MANAGEMENT
AND BUDGET, and OFFICE OF
AUDITOR GENERAL,

Defendants-Appellees.

TAXPAYERS FOR MICHIGAN
CONSTITUTIONAL GOVERNMENT,
STEVE DUCHANE, RANDALL BLUM,
and SARA KANDEL,

Plaintiffs-Appellees,

v                                             No. 160660

STATE OF MICHIGAN, DEPARTMENT
OF TECHNOLOGY, MANAGEMENT
AND BUDGET, and OFFICE OF
AUDITOR GENERAL,

        Defendants-Appellants.

_____

BEFORE THE ENTIRE BENCH

CAVANAGH, J.

## I.  INTRODUCTION

At issue in this case is a dispute over what monies should be included in calculating "total state spending paid to all units of Local Government" under § 30 of the Headlee Amendment, Const 1963, art 9, § 30.  Plaintiffs argue that the state is shortchanging units of local government by improperly inflating that figure.  Specifically, plaintiffs allege that "Proposal A" payments that the state directs to school districts pursuant to Const 1963, art 9, § 11 should not be counted and that neither should state spending for state-mandated local services and activities under Const 1963, art 9, § 29.  We disagree.  Both are properly counted as part of total state spending paid to units of local government for purposes of the Headlee Amendment.  Accordingly, we affirm Part III(B) and reverse Part III(D) of the Court of Appeals opinion.  Plaintiffs also argue that state aid to public school academies (PSAs)[1] should not be counted as part of the total state spending paid to units of local government under § 30.  The Court of Appeals rejected this argument, concluding that PSAs are "school districts," a type of "Local Government" specified in § 33, and, therefore,

_____

[1] Commonly referred to as charter schools.

2

that their state funding is properly counted as part of "total state spending paid to all units of Local Government." We conclude, however, that the panel erred when it held that PSAs are "school districts" as the term is used in the Headlee Amendment. We further hold that PSAs are themselves not a "political subdivision of the state" as voters would have understood the term when the Headlee Amendment was ratified. It is unclear, however, whether the fact that a PSA's authorizing body, such as a school district, intermediate school district, or community college, might be an entity considered a "Local Government" changes that general conclusion. Therefore, we reverse the conclusion reached in Part III(C) of the Court of Appeals opinion that PSAs are "school districts" and remand to the Court of Appeals for its reconsideration of this issue. Finally, we vacate the panel's grant of mandamus in Part III(E) and direct the Court of Appeals to provide further explanation of its decision to grant this extraordinary remedy.

## II. THE HEADLEE AMENDMENT

We begin with a brief overview of the constitutional framework at issue. In 1978, Michigan voters approved an amendment of our state Constitution; that amendment is popularly known as the Headlee Amendment. See Const 1963, art 9, § 6 and §§ 25 to 34.[2] The Headlee Amendment was born out of a nationwide "taxpayers revolt" and was meant to limit legislative expansion of requirements placed on local government, put a freeze on what had been perceived as excessive government spending, and lower taxes at both the local and state levels. *Bolt v Lansing*, 459 Mich 152, 161; 587 NW2d 264 (1998). To

---

[2] The amendment added §§ 25 through 34 to Article 9 of the Michigan Constitution and amended § 6 of Article 9.

3

accomplish this, the Headlee Amendment sets forth "a fairly complex system of revenue and tax limits." *Durant v Michigan*, 456 Mich 175, 182; 566 NW2d 272 (1997).

Although the Headlee Amendment has been the focus of much litigation since its inception, relatively little attention has been paid to § 30—the centerpiece of the instant case. Section 30 provides in full:

> The proportion of total state spending paid to all units of Local Government, taken as a group, shall not be reduced below that proportion in effect in fiscal year 1978-79. [Const 1963, art 9, § 30.]

The parties agree that to maintain 1978–1979 levels of state spending to units of local government as required by § 30, at least 48.97% of state spending must be paid to "units of Local Government."[3] This Court has explained that the phrase "taken as a group" in § 30 requires only that the "overall percentage allotment of the state budget for local units of government must remain at 1978 levels." *Durant v State Bd of Ed*, 424 Mich 364, 393; 381 NW2d 662 (1985). This means that neither specific individual units of local government (e.g., the city of Lansing) nor classes of units of local government (e.g., cities) are entitled to the same proportion of the allotment for units of local government as they received in 1978–1979.

---

[3] As discussed further, the Headlee Amendment defines "Local Government" as "any political subdivision of the state, including, but not restricted to, school districts, cities, villages, townships, charter townships, counties, charter counties, authorities created by the state, and authorities created by other units of local government." Const 1963, art 9, § 33.

4

## III.  FACTUAL BACKGROUND & PROCEDURAL HISTORY

Plaintiffs, Taxpayers for Michigan Constitutional Government and certain individual taxpayers, filed this original action[4] in the Court of Appeals, seeking declaratory, injunctive, and mandamus relief against the state of Michigan; the Department of Technology, Management and Budget (DTMB); and the Office of the Auditor General (collectively, "the state" or "the state defendants").  The basis of these claims is plaintiffs' belief that the state is violating and evading the Headlee Amendment in the way that it counts and classifies monies paid to units of local government.  There are three specific counts of plaintiffs' complaint at issue in this appeal.  First, in Count I, plaintiffs allege that the state defendants violated §§ 25 and 30 by classifying monies paid to school districts pursuant to Proposal A, Const 1963, art 9, § 11, as state spending paid to units of local government.  Second, in Count II, plaintiffs allege that the state defendants violated those same provisions by classifying monies paid to PSAs as state spending to units of local government.  Third, in plaintiffs' Count IV,[5] they allege that funds directed to units of local government for state mandates pursuant to § 29 of the Headlee Amendment should not be counted toward calculating state funding under § 30.

Following discovery and motion practice, both plaintiffs and defendants moved for summary disposition pursuant to MCR 2.116(C)(10) (no genuine issue of material fact).  In a published decision on reconsideration, the Court of Appeals granted the state

---

[4] "Any taxpayer of the state shall have standing to bring suit in the Michigan State Court of Appeals to enforce the provisions of Sections 25 through 31 . . . ."  Const 1963, art 9, § 32.

[5] A third count related to road funding is no longer at issue.

5

defendants summary disposition on Count I, holding that Proposal A spending is properly categorized as state funding to a unit of local government. *Taxpayers for Mich Constitutional Gov't v Michigan (On Reconsideration)*, 330 Mich App 295, 310; 948 NW2d 91 (2019) (opinion by SHAPIRO, J.); *id*. at 332 (METER, J., concurring in part and dissenting in part); *id*. at 337 (BORRELLO, P.J., concurring in part and dissenting in part). The panel majority also granted summary disposition to the state defendants on Count II, over a partial dissent from Judge METER, holding that state aid to PSAs falls within the scope of state spending to units of local government under § 30. *Id*. at 311 (opinion by SHAPIRO, J.); *id*. at 337 (BORRELLO, P.J., concurring in part and dissenting in part). The panel majority granted plaintiffs' motion for summary disposition on Count IV, over a partial dissent from Judge BORRELLO, holding that state spending to fund state-mandated local services as required by § 29 should not be included in the state's calculation of the proportion of total state spending under § 30. *Id*. at 314 (opinion by SHAPIRO, J.); *id*. at 332 (METER, J., concurring in part and dissenting in part). Finally, the panel granted plaintiffs mandamus relief and directed the state to comply with reporting requirements found in MCL 21.235(3) and MCL 21.241. *Id*. at 319-320 (opinion by SHAPIRO, J.); *id*. at 332 (METER, J., concurring in part and dissenting in part); *id*. at 333 (BORRELLO, P.J., concurring in part and dissenting in part).

Both plaintiffs and defendants, left unsatisfied by various aspects of the Court of Appeals' decision, filed separate applications for leave to appeal in this Court. We granted both parties' applications for leave to appeal and directed them to address the issues discussed herein. *Taxpayers for Mich Constitutional Gov't v Michigan*, 505 Mich 1136 (2020).

6

## IV. STANDARD OF REVIEW

"The interpretation of a constitutional provision is a question of law, which we review de novo." *Paquin v St Ignace*, 504 Mich 124, 129; 934 NW2d 650 (2019). This Court's primary objective is to "realize the intent of the people by whom and for whom the constitution was ratified." *Id*. at 129-130 (quotation marks and citation omitted). Thus, we employ the rule of common understanding: "The interpretation that should be given it is that which reasonable minds, the great mass of the people themselves, would give it." *Traverse City Sch Dist v Attorney General*, 384 Mich 390, 405; 185 NW2d 9 (1971) (quotation marks and citation omitted). In determining the common understanding of the voters, the Court may also consider the circumstances surrounding the adoption of the provision and the purpose sought to be accomplished by the provision. *Id*.

A motion for summary disposition under MCR 2.116(C)(10) tests the factual sufficiency of a claim. *El-Khalil v Oakwood Healthcare, Inc*, 504 Mich 152, 160; 934 NW2d 665 (2019). Summary disposition under this rule is appropriate when there is no genuine issue of material fact. *Id*.

## V. COUNT I

In Count I, plaintiffs argue that by including Proposal A funding paid to school districts when calculating total state spending paid to units of local government, the state defendants violate § 30 of the Headlee Amendment. Like the Court of Appeals panel, we disagree.

In 1993, the Legislature passed 1993 PA 145, "which effectively eliminated the authority of school districts to levy millage on real property for local and intermediate school district operating expenses . . . ." *Durant v Michigan*, 238 Mich App 185, 195-196;

605 NW2d 66 (1999). This resulted in billions of dollars in lost revenue for school districts. *Id.* at 196. Thereafter, the Legislature passed 1993 PA 336, "which would fund school districts through an increase in the personal income and single business tax rate, the creation of a new real estate transfer tax, and the levying of a certain level of millage unless the electorate adopted a proposed amendment of the Michigan Constitution . . . ." *Id.* In 1994 Michigan voters ratified constitutional amendments intended to make up for that lost revenue, popularly known as "Proposal A." Const 1963, art 9, §§ 3, 5, 8, and 11. Proposal A "authorized an increase in the state sales and use tax for use in school aid, limited use of local property taxes for school purposes, and authorized other changes in school finance." *Durant*, 456 Mich at 211 n 42. Pertinent here, the new and additional tax revenue collected pursuant to Proposal A was largely dedicated to the State School Aid Fund; those funds are used for aid to school districts, higher education, and school employees' retirement systems. Const 1963, art 9, § 11. Under Proposal A, therefore, the responsibility for school funding was no longer a purely local endeavor supported by local property taxes but instead was managed at the state level through increased statewide taxation. After Proposal A passed, state defendant DTMB began including spending from Proposal A revenue in its calculation of total state spending paid to units of local government under § 30 of the Headlee Amendment.

Plaintiffs argue that by including Proposal A funds paid to school districts out of the State School Aid Fund in the calculation of total state spending paid to units of local government under § 30, the state is violating § 25 of the Headlee Amendment. Section 25 provides:

8

Property taxes and other local taxes and state taxation and spending may not be increased above the limitations specified herein without direct voter approval. *The state is prohibited* from requiring any new or expanded activities by local governments without full state financing, from reducing the proportion of state spending in the form of aid to local governments, or *from shifting the tax burden to local government.* A provision for emergency conditions is established and the repayment of voter approved bonded indebtedness is guaranteed. *Implementation of this section is specified in Sections 26 through 34, inclusive, of this Article.* [Const 1963, art 9, § 25 (emphasis added).]

Plaintiffs argue that by using Proposal A revenue in the calculation of total state spending paid to units of local government, the state has impermissibly shifted the tax burden to local governments. This is because post-Proposal A, a larger share of the 48.97% of state spending goes to schools instead of other units of local government, and this forces local governments to raise taxes in order to provide services that the state had previously funded.

The first flaw in plaintiffs' argument, as the Court of Appeals majority recognized, is that § 25 of the Headlee Amendment is a preface meant to provide context to the amendment as a whole, not an independent statement of a substantive right. *Taxpayers*, 330 Mich App at 300 n 1. In fact, this Court has stated that it is "quite clear that § 25 is merely an introduction" to the following sections of the Headlee Amendment, "not an independent statement of rights or duties." *Durant*, 424 Mich at 376 n 4.[6] The plain

---

[6] The Court of Appeals has reached a similar conclusion several times. See *Commuter Tax Ass'n of Metro Detroit v Detroit*, 109 Mich App 667, 670; 311 NW2d 449 (1981) ("Headlee, [§] 25, states a general purpose, but, by its own terms, is implemented by the sections which follow . . . ."); *Waterford Sch Dist v State Bd of Ed*, 130 Mich App 614, 620; 344 NW2d 19 (1983) (describing § 25 as "an introductory paragraph to the amendment which, by its very language, indicates that its substantive implementation is specified in the sections of the statute which follow"); *Jackson Co v Jackson*, 302 Mich App 90, 93 n 1; 836 NW2d 903 (2013) (rejecting the independent enforcement of § 25).

9

language of § 25 supports this conclusion because it denotes that its "[i]mplementation" is specified in §§ 26 through 34 of Article 9. Const 1963, art 9, § 25; *Durant*, 456 Mich at 182 (explaining that the system of revenue and tax limits created by the Headlee Amendment are "summarized" in § 25 and then "implemented in the following sections").[7]

Plaintiffs point to the Drafters' Notes of the Headlee Amendment, which state that § 25 "specifically prohibits the state from circumventing the intent of the amendment by shifting tax burdens from the state to local governmental levels."[8] While the Drafters' Notes are "one tool available to the courts," they are not authoritative because the notes were not published until after the amendment was passed and "the drafters' intent might have been different than the meaning given by the great mass of people . . . ." *Durant*, 456 Mich at 195-196. Accordingly, the Drafters' Notes are generally "given little weight when the intent of those who ratified or voted for adoption is manifested otherwise." *Durant*, 424 Mich at 382 n 12. Reliance on the Drafters' Notes where, as here, the constitutional language is clear is inappropriate. *American Axle & Mfg v Hamtramck*, 461 Mich 352,

---

[7] Even were we to assume for the sake of argument that § 25 is a substantive provision, there are reasons to believe that any shifting that took place is not the type that the Headlee Amendment would prohibit. Section 25 states, "The *state* is prohibited . . . from shifting the tax burden to local government." Const 1963, art 9, § 25 (emphasis added). If a shift occurred here, it was at the behest of the voters through the passage of Proposal A. Moreover, the responsibility for school funding shifted *from* local government *to* the state, not from the state to local government as prohibited by § 25.

[8] Taxpayers United Research Institute, *Drafters' Notes—Tax Limitation Amendment* (Proposal E, approved by the electors on November 7, 1978, as an Amendment to the Michigan Constitution of 1963), § 25, p 3.

362; 604 NW2d 330 (2000). To the extent that the Drafters' Notes are relevant, however, they explicitly provide:

> *The Preamble to the Amendment, Section 25, serves as a summary of Sections 26 through 34,* inclusive and Section 6, as amended; and spells out . . . the objectives, purposes, and intent of the drafters, petitioners and the voters . . . . [Taxpayers United Research Institute, *Drafters' Notes—Tax Limitation Amendment* (Proposal E, approved by the electors on November 7, 1978, as an Amendment to the Michigan Constitution of 1963), § 25, pp 2-3 (emphasis added).]

In other words, the Drafters' Notes confirm that the drafters themselves did not view § 25 as an independent source of substantive restrictions but as a "[p]reamble" or "summary" of the rest of the Headlee Amendment.[9]

Because § 25 is not a provision that can be independently enforced, our inquiry into whether Proposal A funding should be counted as part of "total state spending paid to all units of Local Government, taken as a group" under § 30 is straightforward. The Headlee Amendment explicitly provides that "Local Government" includes "school districts." Const 1963, art 9, § 33. Proposal A funding paid to school districts is state funding paid out of the State School Aid Fund.[10] Very simply, Proposal A funding is money collected and disbursed by the state to a unit of local government. When determining "total state

---

[9] Taking § 25 line by line evidences its summary nature. The first sentence, "Property taxes and other local taxes and state taxation and spending may not be increased above the limitations specified herein without direct voter approval," speaks to §§ 26 and 31. The second sentence, "The state is prohibited from requiring any new or expanded activities by local governments without full state financing, from reducing the proportion of state spending in the form of aid to local governments, or from shifting the tax burden to local government," refers to § 29, § 30, and then back to § 29, respectively. The third sentence, "A provision for emergency conditions is established and the repayment of voter approved bonded indebtedness is guaranteed," concerns § 27.

[10] See State School Aid Act, MCL 388.1601 *et seq.*

11

spending to all units of Local Government, taken as a group," it is, therefore, accurate to include Proposal A funds in that calculation. Plaintiffs' argument would require this Court to improperly read a nonexistent exception into the § 30 calculation by excluding one type of state spending to a local government.

While plaintiffs believe that the relationship between Proposal A and the Headlee Amendment undermines the purpose of the Headlee Amendment, these provisions are coequal constitutional amendments. Even were we to conclude that Proposal A frustrates the spirit of the Headlee Amendment by creating a new source of tax revenue for the state to collect and disburse and then counting that in the § 30 calculation of total state spending, the decision to adopt Proposal A was a choice the voters made.[11] "[T]he voters themselves determine any constitutional requirements and are fully in control of what will be mandated by the constitution through the ratification process." *Durant*, 424 Mich 379 n 6.

While state funding to units of local government has changed post-Proposal A, the Headlee Amendment never guaranteed a particular level of funding to any particular unit of local government. *Durant*, 424 Mich at 393. With the inclusion of Proposal A funding in the § 30 calculation, it simply cannot be said that units of local government "taken as a

---

[11] We reject plaintiffs' speculation that the voters were totally unaware of the potential impacts that Proposal A could have on the function of the Headlee Amendment. In fact, plaintiffs' own evidence on this point—a May 14, 1993 Detroit News article entitled "Headlee Criticizes Proposal A as 'Tax Shift and Tax Increase' "—reveals that there was public discourse on this very topic before the adoption of Proposal A. The article, published almost a year before Proposal A was ratified, details how Richard Headlee, author of the Headlee Amendment, criticized Proposal A as a "major tax shift" and argued that it would "gut[] Section 30 and protection of local government revenue sharing"—the very same arguments that plaintiffs raise today. Cain, *Headlee Criticizes Proposal A as 'Tax Shift and Tax Increase'*, Detroit News (May 14, 1993), p 2B.

12

group" have collectively suffered.[12]  In sum, § 25 of the Headlee Amendment is not an independent source of a substantive right on which plaintiffs can rely, and their arguments find no support in the plain language of § 30.  On Count I, therefore, we affirm the Court of Appeals' grant of summary disposition to the state defendants.

## VI.  COUNT II

Plaintiffs' Count II is also concerned with school funding, but of a different type— funding for PSAs.  Plaintiffs argue that money paid to PSAs out of the state's School Aid Fund should not be used to calculate total state spending to units of local government under § 30 of the Headlee Amendment.  The Headlee Amendment specifically defines "Local Government" as "any political subdivision of the state, including, but not restricted to, school districts, cities, villages, townships, charter townships, counties, charter counties, authorities created by the state, and authorities created by other units of local government." Const 1963, art 9, § 33.  The Court of Appeals concluded that a PSA is a "school district" within the meaning of § 33, making it a unit of "Local Government."  We disagree.

In 1993, the Legislature authorized the creation of PSAs.  A PSA is a state-supported public school operating under a charter contract issued by a public authorizing body.[13] MCL 380.501(1) of the Revised School Code, MCL 380.1 *et seq*., provides that a PSA is

---

[12] In fact, post-Proposal A, although units of local government other than schools may receive a lesser percentage of the 48.97% portion of the state budget, it seems that each percentage point likely represents more money because the state now takes in additional revenue from Proposal A associated sales tax.

[13] See Michigan Department of Education, *Michigan Charter Schools—Questions and Answers* (November 2017 rev), p 1, available at <https://www.michigan.gov/documents/PSAQA_54517_7.pdf> (accessed June 17, 2021) [https://perma.cc/FPS6-ZWG3].

"a school district for the purposes of section 11 of article IX of the state constitution of 1963 . . . ." That constitutional provision, Const 1963, art 9, § 11, adopted as part of Proposal A, provides for the creation of the State School Aid Fund. The State School Aid Act's definition of "district" also includes both local school districts and PSAs. MCL 388.1603(7).

On the basis of these authorities, the Court of Appeals majority concluded that PSAs receive state funding earmarked for school districts and are, therefore, school districts for the purpose of receiving state school aid. *Taxpayers*, 330 Mich App at 312 (opinion by SHAPIRO, J.); *id.* at 337 (BORRELLO, P.J., concurring in part and dissenting in part). We find no error in this conclusion, but whether the Legislature has decided to treat PSAs as "school districts" for purposes of receiving state funding is beside the point. The Legislature's subsequent enactment of a statute cannot supersede the common understanding of a term adopted by the voters who ratified the constitutional amendment. See *Pillon v Attorney General*, 345 Mich 536, 547; 77 NW2d 257 (1956) ("Neither the legislature, nor this Court, has any right to amend or change a provision in the Constitution."). Moreover, the plain language of MCL 380.501(1) signifies that the Legislature intended that PSAs be considered a "school district" for a *specific* purpose by mentioning that PSAs are "school districts" under Const 1963, art 9, § 11 (establishing the State School Aid Fund).[14] Simply because a PSA is a "school district" for purposes of Proposal A funding does not necessarily mean that a PSA is also a "school district" as

---

[14] MCL 380.501(1) also indicates that a PSA is a "public school" for purposes of Const 1963, art 8, § 2. See *Council of Organizations & Others for Ed About Parochiaid, Inc v Governor*, 455 Mich 557; 566 NW2d 208 (1997).

14

contemplated by the Headlee Amendment. In other words, that the *Legislature* authorized the creation of PSAs and treats them as school districts for the specific purpose of receiving aid from the State School Aid Fund tells us nothing about whether the *voters* would have understood a PSA to be a "local government" for purposes of the Headlee Amendment.

In addition, we conclude that the Headlee voters would not consider PSAs as equivalent with "school districts" as the term was understood at the time the amendment was ratified. Like traditional school districts, PSAs deliver education to the students of this state, but they do not resemble traditional school districts in many other ways. For example, PSAs are organized as nonprofit corporations by a person or other entity,[15] while school districts are legislative creations. PSAs are not limited to a defined local geographic area like school districts.[16] Instead of a locally elected school board directly beholden to the voters of a school district, the governing body of a PSA is made up of a board of directors comprised of privately selected members. MCL 380.503(11). Unlike a school district board, the board of directors of a PSA may enter into a contract with an education-management corporation to manage or operate the PSA or to provide the PSA with instructional or other services. See MCL 380.503c; MCL 380.503(6)(k) and (n).[17] A PSA

---

[15] See Nonprofit Corporation Act, MCL 450.2101 *et seq.*

[16] State public universities, for example, are the authorizing bodies for about 70% of PSAs in this state. See State of Michigan, *Public School Academies by Authorizer* <https://www.michigan.gov/documents/mde/Schools_by_Authorizer_396738_7.pdf> (accessed June 22, 2021) [https://perma.cc/PU5Q-4E3Y]. A PSA must "be open to all pupils who reside within the geographic boundaries of that authorizing body," MCL 380.504(3), which for a state-public-university authorizer is the entire state of Michigan.

[17] See OAG, 1995-1996, No. 6,915 (September 4, 1996).

is funded solely by the state and may not levy taxes like a school district.[18] A PSA, in fact, is often viewed as an *alternative* to the traditional educational services offered by a school district, not an equivalent.[19] Accordingly, we conclude that a PSA is not a "school district" as Headlee voters would have understood the term.[20]

As Judge METER recognized, because a PSA is not a "school district," a specific type of political subdivision of the state, our analysis must shift to whether a PSA can itself be categorized more generally as a "political subdivision of the state." If so, then it is a "local government" under Const 1963, art 9, § 33, and any state spending that it receives

---

[18] We acknowledge the dissent's argument that, following the passage of Proposal A, there are now limitations on the ability of school districts to raise operating funds through property taxes. However, the voters approved Proposal A in 1994—16 years after the voters ratified the Headlee Amendment—and we focus our inquiry on the voters' contemporaneous understanding of the term "school districts." *Walker v Wolverine Fabricating & Mfg Co, Inc*, 425 Mich 586, 596; 391 NW2d 296 (1986) ("The paramount rule of constitutional construction is that the constitution should be given that interpretation which the great mass of people would have understood when they ratified it."). Moreover, unlike PSAs, school districts still retain significant powers of taxation. See, e.g., MCL 380.1212(1) (providing a taxing power to support a building-and-site sinking fund); MCL 380.1351(4) (providing a taxing power to service capital project debts); MCL 123.52 (providing a taxing power for recreational facilities and playgrounds).

[19] See Furst, *The Short But Very Curious Legal History of Michigan's Charter Schools*, 105 West's Ed L Rep 1, 2 (1996) ("These academies were to operate as public schools and thereby be competitive with existing school districts to provide a new initiative for schooling in Michigan, an initiative that would result in better education for the children of the state.").

[20] We note that two of our attorneys general have concluded that a PSA is not a "school district" as a general proposition. See OAG, 1995-1996, No. 6,915 (September 4, 1996); OAG, 2003-2004, No. 7,154 (March 31, 2004). And we are not aware of any cases in which our state courts have concluded that PSAs are, as a general proposition, school districts.

16

should be counted under § 30 when calculating total state spending to units of local government. Because PSAs did not exist when the Headlee Amendment was ratified in 1978, we agree with Judge METER's instinct to consider construction of the term from both before and shortly after the Headlee Amendment's ratification to ascertain whether Headlee voters would have considered a PSA to be a "political subdivision of the state."[21]

We first look to an opinion from our Attorney General from 15 years before the voters passed the Headlee Amendment. OAG, 1963-1964, No. 4,037 (January 2, 1963). There, the Attorney General considered whether a county drainage district constituted a political subdivision of the state. As a general matter, said the Attorney General, "political divisions of the state are those which are formed for the more effectual or convenient exercise of political power within . . . particular localities" and have certain "distinctive marks." *Id*. at 3 (quotation marks and citation omitted). These distinctive marks include that a political subdivision of a state will

> embrace a certain territory and its inhabitants, organized for the public advantage, and not in the interest of particular individuals or classes; that their chief design is the exercise of governmental functions, and that to the electors residing within each is, to some extent, committed the power of local government, to be wielded either mediately or immediately, within their territory, for the peculiar benefit of the people there residing. [*Id*. (quotation marks and citation omitted).]

---

[21] See *McPherson v Blacker*, 92 Mich 377, 383; 52 NW 469 (1892) (" '[W]here a particular construction has been generally accepted as correct, and especially when this has occurred contemporaneously with the adoption of the constitution, and by those who had opportunity to understand the intention of the instrument, it is not to be denied that strong presumption exists that the construction rightly interprets the intention.' "), quoting 1 Cooley, Constitutional Limitations (1868), p 67.

A few years after the Headlee Amendment was ratified, our Court of Appeals similarly wrote that attributes "generally regarded as distinguishing a political subdivision are its existence for the purpose of discharging some function of local government, its prescribed area and its authority for self-government through officers selected by it." *People v Egleston*, 114 Mich App 436, 440; 319 NW2d 563 (1982). Taken together, we conclude that the Headlee voters would have understood a "political subdivision of the state" to mean a geographically limited unit of government formed to exercise political power and that is beholden to a local electorate.[22]

Because PSAs provide educational services, they perform "essential public purposes and governmental functions of this state." MCL 380.501(1). But other characteristics of PSAs lead us to agree with Judge METER that PSAs do not fall under the category of a "political subdivision of the state" for largely the same reasons we concluded that a PSA is not a "school district" as the term is used in the Headlee Amendment.[23] PSAs are nonprofit corporations, which are private entities and not governmental bodies. PSAs do not have limited or local geographic boundaries. The governing body of a PSA is not elected by voters. The governing board of a PSA answers to its authorizing body, not to local voters. *Council of Organizations & Others for Ed About Parochiaid, Inc v Governor*,

_____

[22] As the dissent points out, political subdivisions might also have other characteristics such as the capacity for self-governance or the power of taxation.

[23] The dissent concludes that the performance of essential public purposes and governmental functions of this state "weighs heavily in favor of a finding that PSAs are political subdivisions." We disagree. Numerous state agencies and even quasi-governmental entities perform essential public purposes and governmental functions of this state yet would not be considered "political subdivisions of the state" as the term is used in relation to the definition of "Local Government" in § 33.

455 Mich 557, 575; 566 NW2d 208 (1997). While "the public maintains control of the schools through the authorizing bodies," *id*. at 576, this control is much less direct, or even merely symbolic. Similarly, because a PSA is under the immediate control of its authorizing body, its ability to self-govern is hindered and it has no independent political power. In sum, while PSAs deliver traditional governmental services, their "distinctive marks" are not those of a "political subdivision of the state" as the voters who ratified the Headlee Amendment in 1978 would have understood the term.

The dissent discusses "authorities created by the state" and "authorities created by other units of local government," which are two specifically enumerated types of "political subdivisions of the state" listed in § 33. It points out that "authorities," such as water authorities;[24] garbage, rubbish, and dog-pound authorities;[25] and metropolitan district authorities,[26] were in existence at the time the Headlee Amendment was ratified,[27] yet they have less well-defined geographic boundaries, they lack the power of taxation, and their governing bodies are not generally directly elected by the voters. Because authorities fall within the purview of § 33 and have these characteristics, the dissent reasons that PSAs

[24] MCL 121.29 *et seq*.

[25] MCL 123.301 *et seq*.

[26] MCL 119.1 *et seq*.

[27] The dissent also discusses the Mackinac Bridge Authority, created to construct and maintain the Mackinac Bridge. We are skeptical of the dissent's conclusion that the Mackinac Bridge Authority qualifies as an authority created by the state that is also a political subdivision of the state for purposes of § 33 of the Headlee Amendment. Unlike the other authorities discussed, the Mackinac Bridge Authority is an instrumentality of the state, MCL 254.302(1), and does not exercise political power on behalf of a local population or have a mechanism for local electorate control.

19

must also fall within the purview of the definition of "political subdivision of the state" in § 33.

We cannot say for certain that the authorities mentioned by the dissent would each qualify as political subdivisions of the state as contemplated by § 33; that is not the question we are faced with today. However, assuming that the authorities listed in the dissent are political subdivisions of the state, it does not follow that PSAs must also be political subdivisions of the state. We detect differences between the two entities. First, we disagree that the authorities discussed by the dissent do not have well-defined geographic boundaries given that they are generally made up of the territories comprising the local governmental units that agree to participate in the authority.[28] That certain authorities might have the ability to contract outside that territory[29] or operate within 10 miles of the territory[30] does not expand the authority's own inherent territorial limits. Second, as the dissent recognizes, the fact that a PSA cannot levy taxes is not dispositive of whether it is a political subdivision of the state. Some political subdivisions of the state, such as cities or counties, may levy taxes, whereas others, such as the authorities examined by the dissent, generally cannot. Third, we agree with the dissent that authorities and PSAs are

---

[28] For example, garbage, rubbish, and dog-pound authorities "shall be comprised of the territory within such incorporating municipalities." MCL 123.301. Similarly, metropolitan districts are comprised of the "territory within [the] respective limits" of two or more cities, villages, or townships. MCL 119.1.

[29] See MCL 123.305(1) and (2) (authorizing garbage, rubbish, or dog-pound authorities to enter into contracts with other units of local government).

[30] See MCL 124.406(b) (allowing a metropolitan transportation authority to operate within a 10-mile radius of the authority's territory).

20

generally similarly removed from direct electorate control. The level of direct electorate accountability, however, is not the same for every PSA.

Overall, again assuming that the authorities identified in the dissent are all political subdivisions of the state, we do not find PSAs sufficiently analogous to them to conclude that, if those authorities are political subdivisions of the state, PSAs must also be political subdivisions of the state. We conclude that a PSA authorized by the governing board of a state public university, MCL 380.501(2)(a)(*iv*), is definitively not a political subdivision of the state. A PSA is not itself a political subdivision of the state, nor is a state university. A PSA authorized by the governing board of a state public university is not geographically limited, and it is responsive to the voters of the state of Michigan at large,[31] not to voters of any particular locale. Therefore, those PSAs are not included in the definition of "Local Government" under § 33 of the Headlee Amendment, and any state funding they receive should not be counted under § 30 as part of "total state spending paid to all units of Local Government." However, aside from state public universities, MCL 380.501(2)(a)(*i*) to (*iii*) also empowers the boards of school districts, intermediate school districts, and community colleges to authorize PSAs.[32] If, for example, a traditional school district—a "local government" under § 33 of the Headlee Amendment—experiments with the charter-school model to provide educational services to local children, this might properly be counted as state spending to a unit of local government under § 30.

---

[31] This can be either through appointment to a university's governing board by the governor or through statewide elections. Const 1963, art 8, §§ 5 and 6.

[32] The authorizing body of a PSA "is the fiscal agent" of the PSA that receives payment from the state and "shall then forward the payment" to the PSA. MCL 380.507(3).

We express no opinion on this issue because we believe it to be worthy of further briefing and full consideration by our Court of Appeals. Accordingly, although we hold that a PSA is not a political subdivision of the state, we remand this case to the Court of Appeals to consider whether state funding to PSAs authorized by a school district, an intermediate school district, or a community college should be counted as state spending to a unit of local government for purposes of § 30 of the Headlee Amendment.

## VII. COUNT IV

The next argument plaintiffs advance is that state funds provided to local governments to satisfy state obligations under § 29 of the Headlee Amendment should not be counted in the calculation of total state spending to units of local government under § 30.[33] The Court of Appeals majority agreed. *Taxpayers*, 330 Mich App at 314 (opinion by SHAPIRO, J.); *id*. at 332 (METER, J., concurring in part and dissenting in part). However, we concur with the dissenting judge because the majority's analysis ignores the plain language of the amendment. Therefore, we reverse.

Section 29 of the Headlee Amendment provides:

> The state is hereby prohibited from reducing the state financed proportion of the necessary costs of any existing activity or service required of units of Local Government by state law. A new activity or service or an increase in the level of any activity or service beyond that required by existing law shall not be required by the legislature or any state agency of units of Local Government, unless a state appropriation is made and disbursed to pay the unit of Local Government for any necessary increased

---

[33] We note that the parties present this argument largely in the abstract and have not provided the Court with examples of state-mandated and state-funded programs that are accounted for in the 48.97% portion of the state budget for local government spending but that plaintiffs believe should count toward the 51.03% portion of the state's budget.

costs. The provision of this section shall not apply to costs incurred pursuant to Article VI, Section 18. [Const 1963, art 9, § 29.]

Through § 29, the Headlee Amendment sought to maintain state funding for state-mandated programs in effect when the amendment was passed and to ensure that if the state mandated any new activities or services, those activities or services would come with concomitant state funding. *Judicial Attorneys Ass'n v Michigan*, 460 Mich 590, 595; 597 NW2d 113 (1999). Section 29 "reflect[s] an effort on the part of the voters to forestall any attempt by the Legislature to shift responsibility for services to the local government, once its revenues were limited by the Headlee Amendment, in order to save the money it would have had to use to provide the services itself." *Durant*, 424 Mich at 379.

According to plaintiffs, when the Legislature requires "[a] new activity or service or an increase in the level of any activity or service" and "a state appropriation is made and disbursed to pay the unit of Local Government for any necessary increased costs," Const 1963, art 9, § 29, that money should not be included in calculating the 48.97% of "total state spending paid to all units of Local Government" under § 30. If it is counted, argue plaintiffs, the state may impose funded mandates that reduce the state's "required" payments to local governments. Plaintiffs suggest that, in theory, the state could earmark every dollar of the required 48.97% funding for state-mandated local activities or services and leave $0 for local government discretionary spending.

The Court of Appeals majority agreed, concluding that "when §§ 29 and 30 are read together, they require the state to fully fund the necessary implementation costs of any new mandate imposed on a unit of local government and to provide this funding in addition to the funding paid in satisfaction of the state's § 30 revenue-sharing obligation." *Taxpayers*,

330 Mich App at 314 (opinion by SHAPIRO, J.); *id*. at 332 (METER, J., concurring in part and dissenting in part). In support, the panel majority looked to the Drafters' Notes associated with § 30. The Drafters' Notes state that the "primary intent" of § 30 was to "prevent a shift in tax burden, either directly or indirectly from state to local responsibility" and that "[a]dditional or expanded activities mandated by the state, as described in Section 29 would tend to increase the proportion of total state spending paid to local government above that level in effect when this section becomes effective." *Drafters' Notes*, § 30, pp 10-11. This note, said the majority, supports plaintiffs' position by "evinc[ing] an intent that state-funding obligations arising from new § 29 obligations are to be paid in addition to § 30 revenue sharing." *Taxpayers*, 330 Mich App at 316 (opinion by SHAPIRO, J.); *id*. at 332 (METER, J., concurring in part and dissenting in part).

The majority erred, however, by relying on the Drafters' Notes without considering the plain language of the amendment. *American Axle & Mfg, Inc v Hamtramck*, 461 Mich 352, 362; 604 NW2d 330 (2000) ("[R]eliance on extrinsic evidence [is] inappropriate because the constitutional language is clear.").[34] The calculation of total state spending paid to units of local government under § 30, as discussed in regard to Count I, is

---

[34] The majority also relied on the Drafters' Notes for § 30 without mentioning the Drafters' Notes for § 29. Although we give little weight to these notes, *Durant*, 424 Mich at 382 n 12, we take notice that the § 29 note explicitly states:

> *This section does not necessarily prevent the state from shifting funds from general and unrestricted revenue sharing to the funding of a state mandated activity* but it does prohibit shifting funds from state mandated programs unless the mandate for such programs is eliminated. [*Drafters' Notes*, § 29, p 10 (emphasis added).]

This note supports that funding for discretionary spending is *not* required.

24

straightforward. There are two types of state spending for purposes of § 30—state spending paid to units of local government and all other state spending. The former must make up at least 48.97% of the state budget, and the latter may make up no more than 51.03% of the state budget. Plaintiffs do not argue that the § 29 mandated spending is not "state spending," nor do they argue that it is not spending that is paid to a "unit[] of Local Government." Const 1963, art 9, § 30. Nothing in § 30 suggests that "total state spending paid to all units of Local Government" should not include state spending to local governments to support both new and existing § 29 state mandates. Plaintiffs' argument similarly finds no support in the text of § 29. Section 29 requires the state to provide funding if the state requires a unit of local government to engage in a new activity or service, and § 29 prohibits the state from reducing the financed proportion of the necessary costs of any existing activity or service as provided for in 1978. It is silent as to whether § 29 funds should be included or excluded in the § 30 calculation of total state spending to units of local government.

We do not read language into these provisions that is simply not there. The Court of Appeals majority reasoned that if state spending to fund new state mandates under § 29 could be counted for § 30, it would "supplant state spending intended for local use" and force the same money to perform "double duty." *Taxpayers*, 330 Mich App at 316-317 (opinion by SHAPIRO, J.); *id*. at 332 (METER, J., concurring in part and dissenting in part). But this conclusion effectively creates a new category of spending—"state spending intended for local discretionary use," which is not a type of state spending recognized by the Headlee Amendment—and then treats that category as uncountable under § 30. This is a strained construction not grounded in the language of the amendment. Instead, we

agree with Judge BORRELLO that, with no stated prohibition to the contrary in the plain language of the amendment, "the state is free to shift or reallocate . . . general and unrestricted revenue sharing paid under § 30 to fund the necessary costs incurred by units of local government in providing newly enacted state-mandated activity or service or an increase in an existing mandated activity or service without violating the scheme of the Headlee Amendment." *Taxpayers*, 330 Mich App at 336 (BORRELLO, P.J., concurring in part and dissenting in part).

Therefore, we agree with Judge BORRELLO that state funding provided to units of local government as required by § 29 should be counted for purposes of "total state spending paid to all units of Local Government" under § 30 and that this conclusion "best honors the voters' intent neither to freeze legislative discretion to enact necessary and desirable legislation in response to changing times and conditions nor to permit state government unrestricted discretion in its allocation of support for mandated activities and services." *Taxpayers*, 330 Mich App at 336-337 (BORRELLO, P.J., concurring in part and dissenting in part). State funding to a unit of local government is state funding to a unit of local government, whether that funding is tied to a state mandate or is unrestricted aid for discretionary spending. Accordingly, we reverse the judgment of the Court of Appeals on Count IV.

## VIII.  MANDAMUS

Finally, plaintiffs sought and were granted a writ of mandamus in the Court of Appeals. We vacate the grant of mandamus and remand to the Court of Appeals to clarify its reasoning or reconsider its decision as it deems appropriate.

26

"The primary purpose of the writ of mandamus is to enforce duties created by law where the law has established no specific remedy and where, in justice and good government, there should be one." *State Bd of Ed v Houghton Lake Community Sch*, 430 Mich 658, 666; 425 NW2d 80 (1988) (citations omitted). To obtain this extraordinary remedy, the plaintiff bears the burden of showing that "(1) the plaintiff has a clear, legal right to performance of the specific duty sought, (2) the defendant has a clear legal duty to perform, (3) the act is ministerial, and (4) no other adequate legal or equitable remedy exists that might achieve the same result." *Rental Props Owners Ass'n of Kent Co v Kent Co Treasurer*, 308 Mich App 498, 518; 866 NW2d 817 (2014). "A ministerial act is one in which the law prescribes and defines the duty to be performed with such precision and certainty as to leave nothing to the exercise of discretion or judgment." *Hillsdale Co Senior Servs, Inc v Hillsdale Co*, 494 Mich 46, 58 n 11; 832 NW2d 728 (2013) (quotation marks and citation omitted).

In the prayer for relief of their complaint filed in the Court of Appeals, plaintiffs requested "[m]andamus relief directing the State of Michigan to fully comply with the reporting requirements of MCL 21.235 and 21.241[.]" They did not provide any argument or explanation about this requested relief or otherwise elaborate in their brief in support of the complaint.

These statutes, which implement the Headlee Amendment, impose certain reporting requirements on the governor, MCL 21.235(3), and defendant DTMB, MCL 21.241. MCL 21.235(3) requires that the governor include with the annual budget recommendation an accompanying report of the amount of state disbursements required to be paid to each local unit of government for the necessary cost of each state requirement and the total amount

27

of all disbursements to be paid to local government. MCL 21.241 requires DTMB to collect and tabulate various information, including:

> (a) The state financed proportion of the necessary cost of an existing activity or service required of local units of government by existing law.
>
> (b) The nature and scope of each state requirement which shall require a disbursement under [MCL 21.235].
>
> (c) The nature and scope of each action imposing a potential cost on a local unit of government which is not a state requirement and does not require a disbursement under this act.
>
> (2) The information shall include:
>
> (a) The identity or type of local unit and local unit agency or official to whom the state requirement or required existing activity or service is directed.
>
> (b) The determination of whether or not an identifiable local direct cost is necessitated by state requirement or the required existing activity or service.
>
> (c) The amount of state financial participation, meeting the identifiable local direct cost.
>
> (d) The state agency charged with supervising the state requirement or the required existing activity or service.
>
> (e) A brief description of the purpose of the state requirement or the required existing activity or service, and a citation of its origin in statute, rule, or court order. [MCL 21.241(1) and (2).]

DTMB is then directed to publish this information in a report and submit it to the Legislature. MCL 21.241(3). And the report is to be updated annually. *Id.*

In their answer to the complaint, the state defendants denied that they had not complied with MCL 21.235 but admitted that they had not completed the reporting requirements of MCL 21.241. When plaintiffs moved for summary disposition, they again

included no in-depth discussion of the mandamus issue. In fact, because of plaintiffs' lack of any explanation accompanying their request for mandamus relief, the state defendants argued that the claim had been abandoned. We question, therefore, whether the request for mandamus was even adequately pleaded.

Despite these shortcomings, the Court of Appeals granted plaintiffs their requested relief, explaining:

> It is clear that MCL 21.241 establishes a legislatively mandated duty that the state, through its officers and departments, collect, report, and place on the public record certain information regarding the state's compliance with the Headlee Amendment. The state has breached this duty. It is equally clear that the acts required by these statutory provisions are ministerial and that the failure of the state to undertake such acts undermines the right and role of taxpayer oversight and enforcement conferred by Const 1963, art 9, § 32. As noted by plaintiffs, the failure of the state to comply with the dictates of MCL 21.235(3) and MCL 21.241 "prevents taxpayers from knowing what mandated activity is funded and what is unfunded" and "prevents taxpayers from specifically identifying mandated activity that is included within art. 9, § 30 calculations and what, if any, mandated activity is not included." For these reasons, we deem mandamus to be an appropriate remedy and hereby direct the state through its officers and departments to hereafter comply with the annual reporting requirements of MCL 21.235(3) and MCL 21.241. [*Taxpayers*, 330 Mich App at 319-320 (opinion by SHAPIRO, J.); *id.* at 332 (METER, J., concurring in part and dissenting in part); *id.* at 333 (BORRELLO, P.J., concurring in part and dissenting in part).][35]

The panel later stated that the mandamus relief was to be "prospective only because plaintiffs have waived their claim to compensation for the state's past practice of counting

---

[35] We note that plaintiffs' claim in this Court—that the writ of mandamus is to "prospectively requir[e] state officials, including the Auditor General, to exclude state spending to fund state mandates from the numerator of the § 30 calculation"—is *not* the relief the panel had granted. Moreover, as discussed in Part VII of this opinion, we hold that the § 29 funding is not to be excluded from the § 30 calculation of total state spending paid to units of local government.

funding for new or increased mandates for purposes of § 30." *Id*. at 320 (opinion by SHAPIRO, J.); *id*. at 332 (METER, J., concurring in part and dissenting in part); *id*. at 333 (BORRELLO, P.J., concurring in part and dissenting in part).

This holding is puzzling for many reasons. First, it is unclear why the Court of Appeals granted plaintiffs a writ of mandamus regarding the reporting requirement of MCL 21.235(3) when it does not appear that plaintiffs refuted defendants' assertion that the governor complied with the reporting required by that statute. In their answer to the complaint, the state defendants admitted only to not complying with the reporting requirements imposed on DTMB in MCL 21.241. Second, it is unclear why the Court of Appeals vaguely ordered "the state through its officers and departments" to comply with the statutes when those statutes apply to the governor, MCL 21.235, who is not a named defendant in this action, and to DTMB, MCL 21.241. Third, the panel's explanation that the writ of mandamus was to be "prospective only" because plaintiffs "waived their claim to compensation for the state's past practice of counting funding for new or increased mandates for purposes of § 30" appears to be unrelated to the actual mandamus relief granted—compliance with the annual reporting requirements of MCL 21.235(3) and MCL 21.241.

When the state defendants appealed this ruling, however, they only quarreled with the Court of Appeals opinion insofar as it was unclear whether the mandamus relief granted extended to defendant Office of the Auditor General.[36] While a writ of mandamus might

---

[36] As a result, our grant order only directed the parties to address this particular facet of the mandamus order. *Taxpayers*, 505 Mich at 1136.

30

be appropriate to compel the Auditor General to perform a statutory duty, see *Thompson v Auditor General*, 261 Mich 624, 656; 247 NW2d 360 (1933), it is unclear what statutory duty or other "clear legal duty" the Auditor General or the Office of the Auditor General has in the reporting requirements of MCL 21.235 and MCL 21.241. The Court of Appeals also failed to address whether these duties were ministerial or involved the exercise of discretion.

In light of our disposition regarding Parts III(B) and (C) of the Court of Appeals opinion and because we are unable to discern the nature of the relief requested or granted, we vacate Part III(E) of the Court of Appeals opinion. Although we do not express an opinion on the appropriateness of the remedy, we remand to the Court of Appeals for clarification. On remand, the panel should specify which defendant is failing to perform which clear legal duty and should analyze whether granting the extraordinary writ of mandamus is warranted.

## IX. CONCLUSION

We hold that Proposal A payments to school districts and § 29 state spending to fund state-mandated local services and activities are both properly counted in the calculation of "total state spending to all units of Local Government" under § 30 of the Headlee Amendment. Accordingly, we affirm Part III(B) and reverse Part III(D) of the Court of Appeals opinion. We also hold that the Court of Appeals erred when it held that PSAs are "school districts" as the term is used in the Headlee Amendment and reverse that conclusion reached in Part III(C) of the opinion. We further hold that PSAs themselves are not political subdivisions of the state for purposes of the Headlee Amendment.

31

However, we remand this case to the Court of Appeals to consider whether PSA funding should be counted as spending paid to a unit of "Local Government" if the authorizing body of the PSA is a school district, intermediate school district, or community college. Finally, we vacate Part III(E) of the opinion without prejudice and remand so that the Court of Appeals may clarify its grant of mandamus relief or take other action not inconsistent with this opinion.

Megan K. Cavanagh
Bridget M. McCormack
Richard H. Bernstein
Elizabeth T. Clement (except as to
Part VIII)
Elizabeth M. Welch

STATE OF MICHIGAN

SUPREME COURT

TAXPAYERS FOR MICHIGAN
CONSTITUTIONAL GOVERNMENT,
STEVE DUCHANE, RANDALL BLUM,
and SARA KANDEL,

        Plaintiffs-Appellants,

v                                  No. 160658

STATE OF MICHIGAN, DEPARTMENT
OF TECHNOLOGY, MANAGEMENT
AND BUDGET, and OFFICE OF AUDITOR
GENERAL,

        Defendants-Appellees.
_____

TAXPAYERS FOR MICHIGAN
CONSTITUTIONAL GOVERNMENT,
STEVE DUCHANE, RANDALL BLUM,
and SARA KANDEL,

        Plaintiffs-Appellees,

v                                  No. 160660

STATE OF MICHIGAN, DEPARTMENT
OF TECHNOLOGY, MANAGEMENT
AND BUDGET, and OFFICE OF
AUDITOR GENERAL,

        Defendants-Appellants.
_____

VIVIANO, J. (*concurring in part and dissenting in part*).

I concur in the majority's decision in all respects except as to Part VI regarding funding for Public School Academies (PSAs), colloquially known as charter schools. I dissent because I believe that PSAs, as a category, are political subdivisions of the state under Const 1963, art 9, § 33. Therefore, I believe that state spending for PSAs is properly considered "spending paid to all units of Local Government" for purposes of Const 1963, art 9, § 30 of the Headlee Amendment.

## I.  TEXT OF THE CONSTITUTION

This case requires that we decide whether the phrase "Local Government" in § 30, as defined in § 33, encompasses PSAs. To do so, we must "determine the text's original meaning to the ratifiers, the people, at the time of ratification." *Citizens Protecting Michigan's Constitution v Secretary of State*, 503 Mich 42, 61; 921 NW2d 247 (2018) (*CPMC*) (quotation marks and citation omitted). In other words, we must seek the "common understanding" of the constitutional provisions to ascertain and give effect to "the sense of the words used that would have been most obvious to those who voted to adopt the constitution." *Straus v Governor*, 459 Mich 526, 533; 592 NW2d 53 (1999).

Article 9, § 30 provides, "The proportion of total state spending paid to all units of Local Government, taken as a group, shall not be reduced below that proportion in effect in fiscal year 1978-79." "Local Government" is defined in Article 9, § 33 as "any political subdivision of the state, including, but not restricted to, school districts, cities, villages, townships, charter townships, counties, charter counties, authorities created by the state, and authorities created by other units of local government."

2

The language of § 33 reveals that this section contemplates a broad and inclusive definition of the term "Local Government," given that it includes "*any*" political subdivision. (Emphasis added.) "The commonly understood word 'any' generally casts a wide net and encompasses a wide range of things." *People v Lively*, 470 Mich 248, 253; 680 NW2d 878 (2004).[1] Pertinent definitions of the word "any" demonstrate that there is no restriction on the type of political subdivision included. See, e.g., *Webster's Ninth New Collegiate Dictionary* (1984) ("**1 :** one or some indiscriminately of whatever kind: **a :** one or another taken at random <ask [*any*] man you meet> **b :** EVERY — used to indicate one selected without restriction <[*any*] child would know that>").[2] Second, the phrase "including, but not restricted to" contemplates, by its own terms, that there are entities that qualify as local governments beyond those that are explicitly listed; that is, the list of entities is nonexhaustive.[3]

---

[1] See also *People v Harris*, 495 Mich 120, 132; 845 NW2d 477 (2014) ("[I]t is difficult to imagine how the Legislature could have cast a broader net given the use of the words 'any act' . . . .").

[2] See also *The Random House Dictionary* (1984) (defining "any," in pertinent part, as "every or all"). A court may use dictionaries from the relevant time period to determine the meaning of a particular term in the Constitution. See *CPMC*, 503 Mich at 71 n 64. Additionally, "[b]ecause '[d]ictionaries tend to lag behind linguistic realities,' " it is appropriate to consult dictionaries from after 1978 to understand the meaning of the term when the Headlee Amendment was ratified. *People v Wood*, 506 Mich 114, 133 n 5; 954 NW2d 494 (2020) (VIVIANO, J., dissenting), quoting Scalia & Garner, *A Note on the Use of Dictionaries*, 16 Green Bag 2d 419, 423 (2013).

[3] This definition in § 33 appears broader than that found in the implementing legislation for the Headlee Amendment, MCL 21.231 *et seq*. MCL 21.233(5) defines "local unit of government" as "a political subdivision of this state, including school districts, community college districts, intermediate school districts, cities, villages, townships, counties, and authorities, if the political subdivision has as its primary purpose the providing of local governmental services for residents in a geographically limited area of this state and has

## II. CHARACTERISTICS OF POLITICAL SUBDIVISIONS

To determine whether a PSA is a local government for purposes of the Headlee Amendment, we must determine whether a PSA constitutes a "political subdivision" as that term was understood in 1978. To do so, we look to see if PSAs have the pertinent characteristics of such entities. As the majority explains, these characteristics include "a geographically limited unit of government, formed to exercise political power, and that is beholden to a local electorate."[4] But this list of attributes is not exhaustive or complete; at the time that the Headlee Amendment was ratified, political subdivisions possessed other attributes. Importantly, political subdivisions operated as a division of the state to exercise

---

the power to act primarily on behalf of that area." Section 33 of the Constitution expressly provides that its list of political subdivisions is not exhaustive and does not contain the same restriction of "political subdivision" to entities that are geographically limited and that act on behalf of the people in that area. To the extent that the definition in MCL 21.233 diverges from that in § 33, the one in MCL 21.233 must yield. See *Durant v State Bd of Ed*, 424 Mich 364, 392; 381 NW2d 662 (1985) ("The state may not avoid the clear requirements of [the Headlee Amendment] either by specific statute or by implementation of definitions adverse to the mandate of the people.").

[4] The majority's description is supported not only by Attorney General Kelley's opinion in OAG, 1963-1964, No. 4,037, p 3, and *People v Egleston*, 114 Mich App 436, 440; 319 NW2d 563 (1982), but also by caselaw from other jurisdictions from which the Attorney General and *Egleston* drew their conclusions. See, e.g., *Lydecker v Drainage & Water Comm'rs of Englewood Twp*, 41 NJL 154, 157 (1879); *Dugas v Beauregard*, 155 Conn 573, 578; 236 A2d 87 (1967); *Comm'r of Internal Revenue v Shamberg's Estate*, 144 F2d 998, 1004 (CA 2, 1944).

some governmental function for the public benefit.[5]  They also had a capacity for self-governance.[6]  And political subdivisions sometimes wielded the power of taxation.[7]

In determining the scope of the term "political subdivision" in § 33, it is important to consider the attributes of the other entities on the list because the definition of political subdivision must at least be broad enough to encompass them.  In other words, we cannot define the general term "political subdivision" in a way that would exclude one or more

---

[5] See *Egleston*, 114 Mich App at 440 ("[I]ts existence [is] for the purpose of discharging some function of local government . . . ."); OAG, 1963-1964, No. 4,037, at 3 (describing that they are " 'organized for the public advantage' " and that " 'their chief design is the exercise of governmental functions' "), quoting *Lydecker*, 41 NJL at 157.  This particular attribute—the exercise of governmental functions for the public benefit—was recognized in many decisions prior to 1978, including those from other jurisdictions.  See *Lydecker*, 41 NJL at 156-157; *Shamberg's Estate*, 144 F2d at 1004; *Dugas*, 155 Conn at 578.  See also *Fair v Sch Employees Retirement Sys of Ohio*, 44 Ohio App 2d 115, 118-119; 335 NE2d 868 (1975) ("The term [political subdivision] may be used in more than one sense, and it may designate a true governmental subdivision such as a county, township, etc., or it may have a broader meaning, denoting any subdivision of the state created for a public purpose although authorized to exercise a portion of the sovereign power of the state only to a limited degree.  Broadly speaking, a political subdivision of a state is a subdivision thereof to which has been delegated certain functions of local government.") (quotation marks and citation omitted).

[6] See *Egleston*, 114 Mich App at 440 (describing that a political subdivision has "authority for self-government through officers selected by it"), citing *Dugas*, 155 Conn at 578; OAG, 1963-1964, No. 4,037, at 3 (describing that the electors of the subdivision possess " 'to some extent . . . the power of local government' "), quoting *Lydecker*, 41 NJL at 157.

[7] See OAG, 1963-1964, No. 4,037, at 3 (describing that political subdivisions have " 'the sovereign power of taxation to meet their own necessities' "), quoting *Lydecker*, 41 NJL at 157; *Dugas*, 155 Conn at 578 (holding that an entity was not a political subdivision because, among other things, it had "no power to levy taxes"); *Shamberg's Estate*, 144 F2d at 1003, 1005 (describing that the political subdivision at issue did not have the power of taxation but noting that "the lack of taxing power . . . is only one of the attributes of sovereignty").

enumerated examples. Every constitutional provision "must be interpreted in the light of the document as a whole, and no provision should be construed to nullify or impair another."[8] When specific examples follow a general term, as in § 33, this "can serve the function of making doubly sure that the broad (and intended-to-be-broad) general term is taken to include the specifics." Scalia & Garner, *Reading Law: The Interpretation of Legal Texts* (St. Paul: Thomson/West, 2012), p 204. "When the genus comes first ('all buildings, assembly houses, courthouses, jails, police stations, and government offices') it is a stranger that arrives, so to speak, without an introduction saying it is limited; one is invited to take it at its broadest face value." *Id.* at 205.[9] Accordingly, we must frame our

---

[8] *Lapeer Co Clerk v Lapeer Circuit Court*, 469 Mich 146, 156; 665 NW2d 452 (2003).

[9] Justice Antonin Scalia and Bryan Garner explain that the doctrine of *ejusdem generis* does not and should not apply when specific examples follow a general term. This doctrine states that "[w]here general words follow an enumeration of two or more things, they apply only to persons or things of the same general kind or class specifically mentioned . . . ." *Reading Law*, p 199. The editors of the treatise Sutherland Statutes and Statutory Construction expanded this doctrine in 1973 to state that it also applies when specific words follow general ones. *Id.* at 204, citing 2A Sands, Sutherland Statutes and Statutory Construction (4th ed), § 47:17, p 166. However, Scalia and Garner explain that this expansion was inappropriate; when specific examples follow a general term, this does not restrict the general, in part, because "there is no commonly used verbal formulation . . . that makes that [limiting] function clear in the specific-followed-by-general context. One never encounters a provision that reads 'all assembly houses, courthouses, jails, police stations, government offices, and, *without limitation by reason of the foregoing*, all other buildings.' " *Reading Law*, pp 204-205.

Scalia and Garner's construction of the doctrine is in tension with our current caselaw, which adopted Sutherland's construction that *ejusdem generis* applies when a general term is followed by specific ones. See *Belanger v Warren Consol Sch Dist Bd of Ed*, 432 Mich 575, 583-584; 443 NW2d 372 (1989). For the reasons stated by Scalia and Garner, I believe that our adoption of Sutherland's construction was in error. However, even if I were to apply a limiting construction under the *ejusdem generis* doctrine in this context, it would not change my analysis or conclusion. Our interpretation of the general

6

understanding of the term "political subdivision" by referring to the list of examples provided.

The first enumerated example relevant to my analysis is "school district."[10]  I share some agreement with the majority that PSAs and traditional school districts are not exactly alike.  In particular, as the majority describes, school districts are governed by a school board, whose members are directly elected by the voters in a school district.  MCL 380.11a(5) to (7); MCL 168.642c.  However, the majority downplays the other shared characteristics of school districts that are pertinent here.  First, school districts, like PSAs, perform the governmental function of providing free public education.  See Const 1963, art 8, § 2.  Second, school districts operate in a defined geographic area, see, e.g., MCL 380.626, but may also admit students from the same intermediate school district, see MCL 388.1705, or students residing in a contiguous intermediate school district, see MCL 388.1705c.  Third, though less significant, school districts lack the power to raise operating funds through the imposition of property taxes after the passage of Proposal A.  See Const 1963, art 9, § 11.

---

term (political subdivision) would involve consideration of the characteristics of the specific examples to determine if PSAs are "of the same general kind or class . . . ." *Reading Law*, p 199.  As my analysis demonstrates, consideration of these characteristics, as set forth in the enumerated examples, leads to the conclusion that PSAs fall within the term "political subdivision."

[10] I take no issue with the majority's conclusion that MCL 380.501(1) does little to inform our analysis.  In MCL 380.501(1), the Legislature described that a PSA is a "school district for the purposes of [Proposal A, Const 1963, art 9, § 11]."  This is a legislative declaration that PSAs are school districts only for the purposes of Proposal A, not the Headlee Amendment.

7

In this context, it is also revealing that the ratifiers included on the list "authorities created by the state, and authorities created by other units of local government" as express examples of political subdivisions. Const 1963, art 9, § 33. An authority "is a corporation controlled by a state that has delegated governmental power to that authority for the performance of a state function, rather than acting directly through a state agency." 4 Rathkopf's The Law of Zoning and Planning (4th ed, June 2021 update), § 76:18. These types of entities are created to "perform a special purpose or purposes, or to perform some of the functions of privately-owned public service corporations." 1 McQuillin, Municipal Corporations (3d ed, August 2020 update), § 2:35. These authorities have independence to administer their purposes and have a modicum of autonomy with regard to their separate corporate legal status, freedom from normal governmental management controls, and ability to support themselves monetarily. *Id.* They are generally considered an "instrumentality of the state." *Id.*

Considering authorities that were in existence in 1978 reveals three things about political subdivisions that should affect our understanding of that term in § 33.[11] First, the Legislature did not always define the geographic boundaries of these authorities with precision. Many authorities in existence in 1978 had specific geographic boundaries, such as those of the authorizing municipalities.[12] But that was not always true—some

---

[11] Because we seek the common understanding of authorities in 1978, I look only to entities that were in existence at that time. See notes 12 to 15 of this opinion.

[12] See, e.g., MCL 121.2 (water authorities operate within the limits of the authorizing municipalities); MCL 119.2 (metropolitan districts operate within the limits of the authorizing municipalities). The Charter Water Authority Act, MCL 121.29 *et seq.*, was

8

authorities, like garbage, rubbish, and dog-pound authorities created under MCL 123.301 *et seq.* had boundaries that were not well defined.[13]  MCL 123.301(1) allows two or more municipalities to incorporate authorities for these purposes.  While the authority may contract with any municipality that is a part of the authority, MCL 123.305(1), it may *also* contract with "a city, village, or township that is not a part of the authority," MCL 123.305(2).  In other words, the authority has a choice of where to operate—and it may do so outside the bounds of the authorizing municipalities.  Other authorities in existence in 1978 had similar provisions.  See MCL 254.311 (allowing the Mackinac Bridge Authority to construct a "bridge," which includes all roads, facilities, parks, equipment, etc. connected to the project);[14] MCL 124.406(b) (allowing public transportation authorities to operate in the 10 miles outside of the metropolitan transportation authority "if there is no similar authority established or operating public transportation facilities within such 10 mile extra-territorial distance").[15]

Second, while some authorities had the power to levy taxes directly, many of these authorities lacked the power of taxation and were instead funded by the authorizing body or another public entity.[16]  For example, the Mackinac Bridge Authority was funded by

---

enacted by 1957 PA 4, and the Metropolitan District Act, MCL 119.1 *et seq.*, was enacted by 1929 PA 312.

[13] The joint garbage and rubbish disposal act was enacted by 1947 PA 179.

[14] The Mackinac Bridge Authority act, MCL 254.311 *et seq.*, was enacted by 1952 PA 214.

[15] The Metropolitan Transportation Authorities Act, MCL 124.401 *et seq.*, was enacted by 1967 PA 204.

[16] Examples of authorities with direct taxing power include water authorities, MCL 121.18, and metropolitan districts, MCL 119.3 and MCL 119.4.

bonds that the authority issued itself and by appropriations from the State Highway Department. MCL 254.317. Metropolitan transportation authorities were prohibited from levying taxes themselves; instead, they were funded by tolls, grants, appropriations from participating counties and political subdivisions, or tax proceeds "collected by the state or a political subdivision and returned or paid to the authority pursuant to law or contract." MCL 124.414(a) to (d). Similarly, garbage, rubbish, and dog-pound authorities had "no direct taxing power" but were instead funded by the participating municipalities. MCL 123.308.

Third, and most importantly to the analysis here, the governing bodies of these authorities were almost universally chosen—not by the electorate directly, but by the participating municipalities or state officers. The board of commissioners for water authorities was appointed by the legislative bodies of each participating city. MCL 121.6. The same was true of metropolitan districts. MCL 119.6. Six board members of the Mackinac Bridge Authority were appointed by the governor; the last was to be appointed by the director of the Department of Transportation. MCL 254.302(2). Metropolitan transportation authorities are governed by a nine-member board, all of whom are appointed by the governor. MCL 124.410(1)(d). The governing boards of other authorities, such as garbage, rubbish, and dog-pound authorities and building authorities, were to be selected as provided in the articles of incorporation. See MCL 123.302; MCL 123.955.

### III. ANALYSIS OF PUBLIC SCHOOL ACADEMIES

The characteristics of school districts and authorities outlined above inform the analysis of whether PSAs should be considered "political subdivisions." Like school

10

districts, PSAs provide educational services; these services are a governmental function operated for the public benefit. See Const 1963, art 8, § 2.[17] As the majority recognizes, the performance of these functions unquestionably constitutes the performance of "essential public purposes and governmental functions of this state." MCL 380.501(1). This factor weighs heavily in favor of a finding that PSAs are political subdivisions.

Certain PSAs also operate in a limited geographic area in a similar manner to certain authorities and school districts. If a PSA is authorized by the board of a school district, intermediate school district, or community college, the PSA "shall not operate" outside the authorizing body's boundaries. MCL 380.502(2)(a) to (c). Enrollment in the PSA "shall be open to all pupils who reside within the geographic boundaries of that authorizing body," though it "may be open to all individuals who reside in this state . . . ." MCL 380.504(3).[18] If the authorizing body is a state public university, enrollment "shall be open to all pupils who reside in this state who meet the [PSA's] admission policy." *Id*. But, as defendants correctly assert on appeal, enrollment will be practically limited to the PSA's immediate geographic area. A student living in Marquette likely will not enroll in a PSA in Detroit, even if he or she could do so.

---

[17] See also *L M v Michigan*, 307 Mich App 685, 697; 862 NW2d 246 (2014) (noting that the Constitution requires the Legislature to "provide for and finance a system of free public schools" but "leaves the actual intricacies of the delivery of specific educational services" to schools themselves).

[18] "Shall" in this context indicates a mandatory directive, whereas "may" indicates a permissive one. See *Manuel v Gill*, 481 Mich 637, 647; 753 NW2d 48 (2008) ("In general, our courts have said that the term 'may' is 'permissive,' as opposed to the term 'shall,' which is considered 'mandatory.' ") (citations omitted).

11

In this respect, PSAs resemble other authorities that do not have strict geographic boundaries but will be confined by necessity to a certain area of operations. As discussed above, garbage, rubbish, and dog-pound authorities can contract with any municipality, whether the municipality is an authorizing body or not. The Mackinac Bridge Authority has the authority to operate anywhere that is connected to the Mackinac Bridge. But these authorities will be practically confined to the specific area in which they operate. So, too, are PSAs geographically confined, even if they may be similarly allowed, in some circumstances, to operate in any part of the state or accept students residing anywhere in the state. This practical limitation is similar to Michigan's school-of-choice program in which public schools may choose to accept students residing within the same intermediate school district, MCL 388.1705(2), or residing in a contiguous intermediate school district, MCL 388.1705c. School districts therefore may accept students from outside their own boundaries, but enrollment is still limited to a particular geographic area. Contrary to the majority's conclusion, this factor weighs in favor of a finding that PSAs *are* political subdivisions.

Next, while PSAs lack the power of taxation—"[a] public school academy may not levy ad valorem property taxes or another tax for any purpose," MCL 380.503(9)—this factor is not dispositive. The ability to tax "is only one of the attributes of sovereignty." *Shamberg's Estate*, 144 F2d at 1005. Further, as noted above, authorities often lack this power, yet Const 1963, art 9, § 33 still describes them as examples of political subdivisions. And, as also noted above, school districts also now lack the power to raise operating funds through the imposition of property taxes. Therefore, it is clear that the ability to tax is not a dispositive attribute of a political subdivision.

Finally, contrary to the majority's conclusion, PSAs have sufficient ability to self-govern and have electorate control. The majority correctly notes that the "governing body of a PSA is not elected by voters" and, thus, that the PSA "is under the immediate control of its authorizing body."[19] The majority makes much of the supposed lack of electorate control or self-governance, in part because of the difference between the boards of PSAs and the boards of traditional school districts, which are directly elected and, therefore, have a greater capacity for self-governance.[20] However, the majority fails to acknowledge that governing bodies of authorities are *also* not directly elected and, thus, have a similarly limited ability to self-govern.

In *Council of Organizations & Others for Ed About Parochiaid, Inc v Governor*, 455 Mich 557, 571; 566 NW2d 208 (1997), we addressed whether PSAs were "public schools" for the purpose of Const 1963 art 8, § 2, which requires the Legislature to "maintain and support a system of free public elementary and secondary schools . . . ." The plaintiffs there argued, among other things, that PSAs were not public schools because a PSA "is run by a private board of directors and because the authorizing body has no means for selecting members of the board . . . ." *Id*. at 575. We disagreed, holding that through

_____

[19] A PSA is governed by a board of directors, MCL 380.502(1), but the authorizing body adopts a resolution to establish "the method of selection, length of term, and number of members of the board of directors," MCL 380.503(5). The authorizing body also oversees the PSA, and that oversight must be "sufficient to ensure that the board of directors is in compliance with the terms of the contract and with applicable law." MCL 380.507(1)(d).

[20] The majority also notes that PSAs are nonprofit corporations, but this, too, misses that some authorities are created as nonprofit entities. See MCL 390.951 ("There is created a nonprofit authority as an agency in the department of education, to be known as the 'Michigan higher education assistance authority'.").

13

MCL 380.503(3),[21] "the Legislature has mandated the board of director's selection process" and could "change this process at any time." *Id*. Further, we explained that while the board of a PSA is not chosen by the electorate or the Legislature, "the board of the authorizing bodies is publicly elected or appointed by public bodies." *Id*. Therefore, "the public maintains control of the schools through the authorizing bodies." *Id*. at 576.

As we explained in *Council of Organizations*, the public still maintains control over PSAs through the public authorizing bodies. This is analogous to how authorities work. As discussed above, authorities in existence in 1978 were not controlled by the electorate but rather by the participating municipalities or the governor. Those public bodies and officials are directly elected, giving the public direct control over the authorities only through an intermediary. Further, some of these authorities are governed by articles of incorporation that are expressly adopted by the legislative body of municipalities. See MCL 123.301; MCL 123.955. In these latter examples especially, the municipalities have the ability to control the self-governance of the authority through the adoption or rejection of the articles of incorporation.[22] Because they have a similar governance structure, PSAs have a sufficient ability to self-govern to qualify as a political subdivision.

The factors of electoral control and self-governance weigh in favor of finding that PSAs are political subdivisions. The electorate still has control over PSAs through the

---

[21] This provision is now codified in MCL 380.503(5). See note 19 of this opinion.

[22] Attorney General Kelley deemed this indirect control to be sufficient when he stated that " 'to the electors residing within each [political subdivision] is, to some extent, committed the power of local government, *to be wielded either mediately or immediately . . . .*' " OAG, 1963-1964, No. 4,037, at 3, quoting *Lydecker*, 41 NJL at 157 (emphasis added). If the electors have mediate, i.e., indirect, control of an entity, as is true with PSAs, that indirect control is enough to support a finding that the entity is a political subdivision.

14

authorizing body, and PSAs still possess the ability to run their own affairs, even if the authorizing body oversees those affairs. A political subdivision does not need to have either *direct* electoral control or *total* self-governance for purposes of the Headlee Amendment. Rather, in light of the authorities in existence at the time of ratification, so long as there is some public, electoral control of a political subdivision through an authorizing body, municipality, or state officer, that is enough to weigh in favor of finding that an entity is a political subdivision. If authorities are expressly considered political subdivisions for purposes of § 33 and the electorate has the same level of control over both these authorities and PSAs, we should treat PSAs in the same manner as authorities.

Therefore, under a proper interpretation of § 33, PSAs qualify as political subdivisions.

## IV.  CONCLUSION

For these reasons, I respectfully dissent from Part VI of the majority opinion and would hold that state spending for PSAs qualifies as part of the "total state spending paid to all units of Local Government" under § 30. Accordingly, I would affirm the judgment of the Court of Appeals on that issue.

> David F. Viviano
> Brian K. Zahra

15

TAXPAYERS FOR MICHIGAN
CONSTITUTIONAL GOVERNMENT,
STEVE DUCHANE, RANDALL BLUM,
and SARA KANDEL,

        Plaintiffs-Appellants,

v                                       No. 160658

STATE OF MICHIGAN, DEPARTMENT
OF TECHNOLOGY, MANAGEMENT
AND BUDGET, and OFFICE OF
AUDITOR GENERAL

        Defendants-Appellees.

_____

TAXPAYERS FOR MICHIGAN
CONSTITUTIONAL GOVERNMENT,
STEVE DUCHANE, RANDALL BLUM,
and SARA KANDEL,

        Plaintiffs-Appellees,

v                                       No. 160660

STATE OF MICHIGAN, DEPARTMENT
OF TECHNOLOGY, MANAGEMENT
AND BUDGET, and OFFICE OF
AUDITOR GENERAL,

        Defendants-Appellants.

_____

CLEMENT, J. (*concurring in part and dissenting in part*).

I concur in full with the Court's resolution of the substantive Headlee Amendment claims. I dissent only as to the Court's disposition of the state's challenge to the writ of mandamus issued by the Court of Appeals (acting as a trial court) in Docket No. 160660. While I concur with the Court's decision to vacate the entire mandamus portion of the Court of Appeals opinion,[1] because this aspect of plaintiffs' case was inadequately pleaded I would not direct that Court to continue struggling on remand with an issue that is not adequately framed.

Any debate about whether a case has been adequately pleaded obviously should begin with a discussion of the elements of the action. "To support mandamus, plaintiffs must have a clear legal right to performance of the specific duty sought to be compelled; defendants must have the clear legal duty to perform such act; and it must be a ministerial act . . . ." *Toan v McGinn*, 271 Mich 28, 34; 260 NW 108 (1935). A "ministerial act" is one "where the law prescribes and defines the duty to be performed with such precision and certainty as to leave nothing to the exercise of discretion or judgment." *Id*. (quotation marks and citation omitted).

While the majority of the Court of Appeals' jurisdiction is appellate, it has some limited original jurisdiction, including over actions challenging compliance with the Headlee Amendment, see Const 1963, art 9, § 32, so this action was initiated when plaintiffs filed a complaint in that Court. The named defendants were the state itself; the

---

[1] Although the lead opinion in the Court of Appeals was only signed by Judge SHAPIRO, the partial dissents from Judges METER and BORRELLO confined their disagreement with Judge SHAPIRO to other issues and otherwise concurred with his analysis of the mandamus component of this case. As a result, I refer to Judge SHAPIRO's opinion as the opinion of the Court when analyzing this mandamus question.

Department of Technology, Management and Budget; and the Office of the Auditor General. As the majority notes, "There are three specific counts of plaintiffs' complaint at issue in this appeal," and there was also a fourth count that was disposed of (relating to highway funding) before the case reached us. All four counts were substantive Headlee claims; not one of them was a count seeking a writ of mandamus. As the majority notes, the only mention of mandamus in the complaint is a single line in the prayer for relief asking for "[m]andamus relief directing the State of Michigan to fully comply with the reporting requirements of MCL 21.235 and 21.241[.]" The complaint offers no allegations about what legal duties those statutes impose on any public officers, and indeed, arguably no actual public *officers* are named as defendants, inasmuch as corporate entities (the state, a department, and an office) are named rather than actual officers. The majority notes that plaintiffs' briefing in the Court of Appeals "did not provide any argument or explanation about this requested relief . . . ."

In its opinion resolving the case, the Court of Appeals granted mandamus relief to plaintiffs. The opinion, however, is as vague as plaintiffs' complaint. The Court of Appeals noted that MCL 21.241 "establishes a legislatively mandated duty that the state, through its officers and departments, collect, report, and place on the public record certain information regarding the state's compliance with the Headlee Amendment," but "[t]he state has breached this duty." *Taxpayers for Mich Constitutional Gov't v Michigan (On Reconsideration)*, 330 Mich App 295, 319; 948 NW2d 91 (2019) (opinion by SHAPIRO, J.). After concluding that the requested actions were ministerial, the Court "deem[ed] mandamus to be an appropriate remedy and hereby direct[ed] the state through its officers and departments to hereafter comply with the annual reporting requirements of MCL

3

21.235(3) and MCL 21.241." *Id*. at 320 (opinion by SHAPIRO, J.). Its opinion did not describe which officers need to perform which duties. The state sought leave to appeal in this Court, asking for relief specific to the Auditor General. The state phrased the question presented here as:

> The Auditor General reviews and determines how state funds are spent and examines whether the State properly accounts for spending to units of local government. The Court of Appeals' opinion did not expressly address the issue of mandamus against the Auditor General but may imply that its review and determination under existing laws were subject to mandamus relief. Would mandamus relief as to the Auditor General, based on the claims raised for the first time in this case, i.e., despite no prior court decision that its processes were contrary to law, represent clear error?

In my view, the state's conditional phrasing in its application for leave to appeal should have been a red flag that what it was asking for was an advisory opinion. We were effectively asked: *if* a court tried to hold the Auditor General in contempt, *would* that be legally viable (and if so, under what circumstances)? Baked into that are questions about the scope of the Auditor General's responsibilities under the pertinent statutes as well as how the Auditor General properly would respond to the substantive Headlee ruling. Judicial review of these questions is frustrated by the fact that plaintiffs have failed to allege any *specific* legal duty they want performed, nor have they "connected the dots" between any such duty and a *specific* officer who must perform it. The confusion is underlined by the fact that plaintiffs' brief in Docket No. 160660 says that "[t]he only mandamus relief at issue on this appeal is the Court of Appeals grant of mandamus prospectively requiring state officials, including the Auditor General, to exclude state spending to fund state mandates from the numerator of the [Const 1963, art 9, § 30] calculation." This appears

4

*nowhere* in the Court of Appeals opinion. The mandamus relief the Court of Appeals directed relates to *reporting requirements* under MCL 21.235 and MCL 21.241.

We are faced, it seems to me, with a mess. On the one hand, it appears that the state's appeal essentially asks us for advice, which we are not in the business of providing. But the reason the state wants advice is because the Court of Appeals judgment against the state is extremely vague—as vague as plaintiffs' complaint. Further contributing to the confusion is that plaintiffs themselves do not appear to accurately represent what it is that the Court of Appeals ordered; their characterization of what is "at issue on this appeal" appears ungrounded in the text of the Court of Appeals opinion we are asked to review. Our pleading rules require that a complaint contain "[a] statement of the facts . . . on which the pleader relies *in stating the cause of action*, with the specific allegations necessary reasonably to inform the adverse party of the nature of the claims the adverse party is called on to defend[.]" MCR 2.111(B)(1) (emphasis added). It seems clear to me that this complaint is inadequate. It has long been established that mandamus is an action at law, see *Woodworth v Old Second Nat'l Bank*, 144 Mich 338, 338-339; 107 NW 905 (1906), and as with any other action at law, the burden is on the plaintiff to plead facts establishing the elements of the cause of action. That simply is not the case here—plaintiffs do not even list mandamus as one of the counts in their complaint. Perhaps as a result, plaintiffs' complaint fails to allege any "specific duty" to be performed, nor does it identify any "defendants [who] have the clear legal duty to perform such act[.]" *Toan*, 271 Mich at 34.

In response to this state of affairs, the majority "vacate[s] the grant of mandamus and remand[s] to the Court of Appeals to clarify its reasoning or reconsider its decision as it deems appropriate." While I certainly prefer this disposition of the case as opposed to

5

affirming the judgment of the Court of Appeals, I would simply vacate this aspect of the judgment as having been erroneously rendered and would not direct the Court of Appeals to continue shadowboxing with this poorly pleaded aspect of the case. This is all the more so when we consider the arm's length manner in which business is conducted in the Court of Appeals; it has no convenient mechanisms for a panel of its judges to take the steps a trial court might take to straighten out confusion of this sort, like holding a status conference with the litigants. See MCR 2.112, 480 Mich clviii, clx-clxii (YOUNG, J., concurring) (discussing the "practical difficulties associated with the Court of Appeals['] exercise of original jurisdiction" given that "[n]one of the tools available to our circuit courts for processing trials are available" to it and its "primary function is revisionary," leaving it "ill-equipped to evaluate the claims and defenses in a complex and fact-intensive original action without the assistance of the parties in developing the factual bases for their claims and defenses"). I believe that the best resolution of the mandamus issue would simply be to hold that plaintiffs' complaint was inadequate and vacate Part III(E) of the Court of Appeals opinion without directing the Court to work further on the issue on remand.

Elizabeth T. Clement